Kennedy. With me is Kyle Stevens from my office, who's also on the brief. We represent Michael Racusin, who is the appellant on two issues today. The first is the failure to award prejudgment interest on the jury verdict in the district court. And the second issue is Mr. Racusin is the appellant on the district court's award of attorney's fees to Mr. Hartunian, who is his prior counsel, counsel who preceded me. I'll address both of those issues. First, the prejudgment issue interest. It's pretty simple and straightforward. We obtained a jury verdict. Are you going to, what about the jurisdictional, the question about the, whether the appeal was taken on time and all of that? Yeah, I think we prevailed on that at the motions panel, said they could raise it again at the merits panel. It's pretty clear that there are two separate judgments that were issued here. And the attorney's fee award was first, that we took an appeal from that to say, as Mr. Hartunian did, that we should have waited until the judgment on the underlying case was entered. It really doesn't work. The parties aren't the same. They're two separate judgments. The jury verdict was $2,160,000. And the district court, keep in mind this was the third time this case had been tried. The first two times, the district court awarded prejudgment interest. But this time, the district court did not. The underlying dispute was there was an agreement between the parties, performance was due without dispute, May 15th, 1996. Performance called for the delivery of something that was also undisputed, 337,500 shares of stock following an initial public offering. There's also no dispute that that obligation was breached. That stock was not delivered. Mr. Rackeson sued for money damages. The issue that went to the jury in the third trial was one easy issue. What were Mr. Rackeson's damages, i.e., what was the value of that stock on the date of the breach, May the 15th of 1996? And the testimony was simple and straightforward on that. Our principal witness was an expert, John Main, who's from the Bay Area. He said the damages are easy. I've been in these transactions for 25 years. He could have sold that stock in one of two ways. He could have dumped it all on the market, in which event he would have taken a 25 percent discount, or he could have leaked it out over time and sold day by day. Mr. Main's, the entirety of his testimony and direct examination is attached as an excerpt record, and he put two different damage figures on it. Leaking it out over time would be about 2,000,007. Putting it all on the market at once would have been about 2,000,002. The district court, however, said that because evidence had to be presented at trial as to the precise amount of the damage, there was no way to know or ascertain the value of the stock, i.e., the amount of damages, and therefore you can't have prejudgment interest on that. Now, put aside for the moment the fact that he did award prejudgment interest the first two times the case was tried, but that decision as to the applicable law was, with all due respect to Judge McKibben, who's a good judge, he got that wrong. As a legal matter. As a legal matter. It's an abuse of discretion. That's how you get the abuse of discretion, a nesting legal problem. Describe what it is. The abuse of discretion here is one of two things. We said this in the brief. You can look at it one of two ways. It's a failure to follow well-settled law or it's an exercise of discretion based upon an erroneous interpretation of the law. If you look at the Nevada cases on this, I mean, the Nevada Supreme Court's developed this doctrine pretty well. Back in the Paradise Holmes case, which is from 1968, the Nevada Supreme Court said, look, let's make this clear on precisely liquidated amount. You can have an obligation which is a certain obligation. And the fact that you have to go to trial to prove exactly what the amount of the obligation is doesn't mean you're not entitled to prejudgment interest. A few years later, in 1973, in the Southdown case, the Nevada Supreme Court made a decision that is real similar to what we have here. And it really exemplifies the way that the doctrine works. In that case, there was a, what you could call a squeeze-out merger. And the one shareholder who was being squeezed out exercised the rights available under statute to have the stock appraised. And what the district court did was it, according to statute, appointed three appraisers. Each of those appraisers was instructed to do an appraisal utilizing the three most common means of appraising fair value. So you had three appraisers doing it three ways. The report went to the district court. So in essence, you had three appraisals with using nine, well, there were nine separate methodologies used. District court came to a value and said, well, I can't give you prejudgment interest on that amount of money that you're due. And the reason, the district court said, was because, you know, we had to take this evidence and prove precisely what it was. Sure, there was an obligation to pay. But we didn't know the exact amount until the evidence came on. The Nevada Supreme Court reversed that and said, no, that is not how the doctrine is applied. If there is an interest rate, which we know, if there is a date certain that the obligation or the performance was due, and if the value of that obligation or the value of the performance is ascertainable by resort to market data or market information, then you're entitled to prejudgment interest. Now, the two other cases from Nevada, one is another Nevada Supreme Court case, and I think it's pronounced Schope, S-C-H-O-E-P-E. In that case, you're entitled to prejudgment interest. But here, though, I mean, I guess the district court's final decision was because the exact amount was unknowable until you had the jury trial, therefore, it didn't fit within the Paradise Homes. Was that basically his view? That's basically what he said. So he misconstrued the third prong in your view, because this 2-point-whatever-million was the base amount that was out there. I don't want to say it was the base amount, but it comes in just under what our experts said, and that was the value of the stock. I mean, what we had, what the expert did, as you can see from the excerpts of record, the expert said, well, $337,500 share, and there were some offsets as well. What does N. Ray Siegel tell us? Excuse me? N. Ray Siegel, S-I-G-A-L, what does that tell us? I don't know. You're not familiar with that case? No. Well, it's a Ninth Circuit case that's pretty close to what we have here. I'm sorry. Yeah, I agree. And that's the case where the Ninth Circuit expresses its policy about prejudgment interest. Well, yeah, and it was talking about a situation involving, I think, the same Nevada law that we're dealing with here. Right. And I focused on the Nevada Supreme Court cases mainly because it's a question of state law. I know that the circuit has interpreted it, but I went right back to the Supreme Court. That's what Judge McKibben was doing. So all we did at the trial was we put on the evidence of what the trades had been, what the price of the stock was in the market. I mean, really the essence of market information and market data. And we put it on through an expert witness who said, look, this is what it is, and this is every day what it traded at. And I've been in this business 25 years, and Mr. Maine said, look, this is what the value was. Resorting really to the essence of market data, stock quotes, and his expertise in interpreting and applying them. And Judge McKibben, he misapplied Nevada law. What he did was he applied the two cases where the Nevada Supreme Court correctly denied prejudgment interest. One is the Hornwood v. Smith-Sfutkin case, which involved a breach of an implied covenant of an anchor tenant to stay in a shopping center. And the damages were determined by, as a result of the anchor tenant leaving, the anchor tenant asked for prejudgment interest. And the Supreme Court said, well, wait, that doesn't have the characteristics of what we require in the doctrine. There's not an obligation requiring you to do something on a certain date, and we sure can't tell what the damages are by looking at market data, because there's no market data about the impact of an anchor tenant leaving a particular shopping center. The other one is the Janess case, and that is the claim was breach of an oral partnership agreement. And the Supreme Court, applying the rule there, said the same thing. This is just not the sort of case where there is a certain obligation to perform a certain act at a certain time. And the two cases, therefore, that the district court relied on, really they fall outside the somewhat well-defined in Nevada parameters of the doctrine, which the Supreme Court has said repeatedly, if you have a performance obligation, date certain, you know what the interest rate is, and the value of that obligation is ascertainable from market data, then the fact that you have to present evidence at trial to precisely calculate the value of that obligation does not mean that you cannot get prejudgment interest. So this is like Southdown stock and Sheppey's rent. Pretty close. Sheppey's rent said, I think it's a fair market value, fair rental value of the property. You took market data and said, what is that? In Southdown, it was the fair value of the stock. You appoint three appraisers. They appraise it three different ways. District court comes to a conclusion as to the value. I mean, this case is really within the reasoning in those. And the Hornwood and the Ginesse cases, they fall well outside the doctrine. And so with respect to the prejudgment interest, we think that issue is real simple, real straightforward. We're fortunate that we have a string of Nevada Supreme Court cases that are pretty close on point here. We think Judge McKibben's order should be reversed and that this court should award Mr. Rackeson the prejudgment interest. Now, fortunately also, the numbers are not in dispute. The calculations. Calculations. Nobody wants a remand. Am I correct about that? We've spent some time in Judge McKibben's court on this case, and he's made it clear he does not want to see this case again. But we're also fortunate because this court can do those calculations. It's a precise number. Precise number. It's $1,383,036.15. That's the statutory rate which appears in the appendix to our brief from May 15 of 1996 to November 14 of 2002. And those numbers are not disputed. We ran them out of a computer program, and I think we attached that. Is it May 15 or May 16? We have used May 15. That's the date of delivery that he would have had the stock. So theoretically, if it had been delivered, he could have sold it immediately. But that's the date we've used throughout. Now, one other thing, too. There was a one-year holding period alleged, saying this was stock that an insider had received, etc., etc. So we're talking about the value of the stock on that day, May 15 of 1996. Our expert said, I will assume you could start selling one year from that date. You could start selling. It doesn't affect the value because it still has a value on that date. It's just that you couldn't have made the first sale for a year. And if you read his testimony, he said, that's the assumption I make. When I come to value. The second item is the attorney's fees that Mr. Hartoonian received. That was decided by this court. The principle to apply was decided by this court in November of 2002, when we were here for the second time. The district court had said that Mr. Hartoonian, even though he had been discharged, would be entitled to 33 percent of everything that Mr. Rackeson recovered in the future. And that's after I undertook to represent him and we were going to go to trial and try the case to a jury on damages. This court said, no, once you're discharged, as he was, your entitlement to the contingency ceases. You get quantum merit recovery. That went back to Judge McKibben. Now, what Judge McKibben should have done was he should have, from the date of the second retainer agreement up to the date that Mr. Hartoonian was discharged, he should have recovered quantum merit. We know what that was because we have his timesheets and we were able to calculate that out precisely into the number of hours that he would be entitled to. And that number comes to $128,760. But Judge McKibben didn't do that. He said, I'm going to give him quantum merit for the entire time that he's been in the case. Why isn't that proper? It's not proper because under the first contingency fee agreement, when the judgment was paid after the first trial, which was about $732,000, Mr. Hartoonian took his contingency of $108,000. As it turned out, he wasn't entitled to it because the appeal that, you know, there was no recovery, really. I understand. But that contract was fully performed and a new contingency fee agreement was then entered into. If you brought an action, you had a contingency fee agreement and you got a big award and then it was an appeal and the award was set aside, you think you're entitled to your contingency? No, but that's not what happened here. What happened here was the award was paid, he took his contingency fee and then entered into a new contingency agreement. So the first agreement was fully performed and fully paid and a second one was entered into. Well, how could that be when he didn't actually recover under the first? I mean, he did, Your Honor, because the judgment was paid. The $732,000 was paid. Right, but then it was unpaid. No, but it wasn't unpaid because Mr. Rackeson, Mr. Hartoonian had taken that money. He didn't give it back. He kept it. And Mr. Rackeson didn't... Well, consider him as basically a fiduciary holding the money at that point. Why wouldn't you? One could consider him as a fiduciary. Well, he is under ethical rules. I mean, if he's not owed it, then he's holding it in effect in trust or in escrow. But what happened was, that's not what happened. They did a new contingency contract. Right. That first contract, therefore, and we've briefed this, that first contract was fully performed, paid, and superseded by the second contract. And that is clearly how that contract has to be treated. Mr. Hartoonian never refunded the money. Mr. Rackeson never refunded the judgment that was paid to him. What happened was... Then, as a result of this decision and after the appeal, it was irrelevant. The order was rescinded. That's right. There was an order to return it, and actually Mr. Hartoonian took a notice of appeal from that order. But that died. It was treated as a credit and an offset in the second trial. So what Mr. Hartoonian ended up doing was the judge went back and undid the first contingency fee agreement, which had been fully performed and paid, and said to Mr. Hartoonian, I'll just give you quantum merit for the whole way. Now, this Court, in its decision in November of 2001, after the second appeal, didn't do that. This Court treated that agreement as having been performed, paid, and superseded. The only issue was, what does Mr. Hartoonian get under his second contingency fee agreement? And this Court said, you don't get the contingency. We're going to remand it and give you a quantum merit recovery. We have done all those calculations again in the brief, and I don't need to go through them here. The last issue is, who pays Mr. Johns, who is a lawyer that Mr. Hartoonian hired? And all I want to do is direct the Court's attention to Mr. Hartoonian's letter. It's in the excerpts of Record 158 at page 30. Mr. Hartoonian writes a letter, and he says, the fees payable to Mr. Johns are my responsibility. Well, I don't think that gets you to third base, much less home plate, because he's committed to having to pay that. If the client goes bankrupt, dies, doesn't pay, whatever, he's committed because he hired him. But didn't the judge find that his hiring had been approved by your client? No. Interestingly enough, there were six or seven additional lawyers hired. I know, but I'm just talking about Mr. Johns now. No. He – I don't think there is any evidence that Mr. Rackerson actually approved Mr. Johns' hiring. Mr. Hartoonian said, I have the inherent authority to hire him. He needed a local counsel, didn't he? Johns was local counsel. Johns was local counsel, that's right. And Mr. Hartoonian says, well, I pay him. Okay. But Mr. Rackerson never hired him, never approved his hiring. Did the district court find the factual matter that Rackerson agreed to Johns' representation along with Mr. Hartoonian? Yeah, there's some sort of an implied agreement. Okay. So that's a factual finding of – and, of course, if you can't go to court without local counsel, and if the judge then made that finding, how would we – on what basis would we disturb that finding? The question is not if he approved him. Obviously, he was there and he never said, who is this? But who has to pay for him? He may approve him being there when Mr. Hartoonian writes a letter saying, paying him is my responsibility. Mr. Rackerson didn't hire him, never agreed to pay him. Mr. Hartoonian says, I will pay him. That's the issue, is who pays him? Mr. Rackerson didn't agree to pay him. Mr. Hartoonian did. Well, in our scope of review, though, you'd have to find it was clearly erroneous what the judge said concerning the employment of Mr. Hartoonian. That's right. Okay. I don't have much time left. One second. One second. It's gone. Thank you, counsel. We'll hear from the other side. Thank you, Your Honor. Sam Benham for Leroy's Horse and Sports Place, and I'm going to address the prejudgment interest issue. I've agreed to split my time with Mr. Hartoonian, so I will have ten minutes. First, let me state that Judge McKibben did not abuse his discretion. He correctly interpreted Nevada law on this issue, and he correctly applied it to the facts. Nevada law on this issue, Mr. Kennedy is correct, it really is explained in the Paradise Homes case. Paradise Homes under Nevada statute that has existed other than changes in the interest rate, but has existed in a substantive form since approximately 1917, states that before prejudgment interest will be allowed, you have to have three things come together. You have to have the rate of interest, when the money is due, and what the amount is. The rate is simple. That's stated in the statute. When the money is due, the court looks at performance, when performance is due. The third factor is the amount. It sets out a specific formula that you must use to determine the amount, and to do that you've got to look at the contract except for the last factor. The first is a sum certain in the contract. That's not at issue here. One-and-a-half percent of whatever plus 150,000 cash. That was for the stock, Your Honor, yes, but not for a sum certain in dollars. The second is if it's performance, the performance must be stated in dollars. That's not in our contract either. In dollars? Yes, Your Honor. How do you explain Southdown and Sheppey? The Southdown case, Your Honor, I would explain is a three-two result-oriented opinion, and let me tell you why. So it's just. But we still have to abide by it. We do, but let me tell you why it's easily distinguished from this, from the case we have. In Southdown, it was a stock merger, and under Nevada's corporate statutes at that time, the two paradise factors, the performance and the amount, that Supreme Court looked to Nevada's corporate statutes, and they said we will determine that through the corporate statutes. That gives us the amount. We get the appraisers. We hire them. It goes through the court. That was the formula. It had nothing to do with the contract, which is what the paradise case requires. For the performance, they did the same thing. They went, and they went to Nevada's corporate statutes, and they said this is the date of performance. The date of the merger is the date that you became a creditor. Therefore, that was the date of performance. But now they were stuck. They had nowhere to go to find the rate. The only place they could go is back to 99040, and they said, well, here's a rate of interest in that, so we'll use the corporate statutes in this part, and then we'll find the rate over in this statute. I don't think that Southdown, other than it says stock in that case, has any bearing on what happened in this case. And the same if you move to the Shope case. A careful reading of the Shope case shows that it did comply with Paradise. If you look at that, Shope was a predecessor in interest, or he came into the contract after another party. There were people in that contract, and the court was looking at the history of that contract. It was a rent contract. If you look at footnote three of the Shope case, it says in there that Shope argued part of his prejudgment interest should be on the six-month lump sum payment. That's how he wanted it calculated from the rent contract. Now, there's no discussion of how the court came to that, but based upon those inferences, clearly the court had something within the four corners of that contract to say it fits within Paradise and prejudgment interest is allowed. I mean, I'll tell you what's odd here is that in many other states, prejudgment interest would be construed as strictly as you would like to see it. I mean, that is probably the traditional rule, I will say. But the Nevada cases, in contrast to some other states, seem to suggest that this amount, the actual amount, can be determined at trial. And that's what they did, isn't it, in the Shope case and Paradise? And that's exactly what happened here. So I still am having trouble distinguishing anything that happened here from any of those Nevada cases. Well, Your Honor, in those cases, there was a formula within the contract. Let me put it... And you don't have that here? We do not have a formula within the contract here, no, Your Honor. I read it as a pretty clear formula. All I need is an amount to apply it to. Your Honor, you have a formula to get the amount of stock in the contract, but that has to be reduced to dollar damages. Southdown says it's immaterial that the jury has to reduce it to a dollar figure. Immaterial, that's their word, not mine. But then if you read that case and you want to say that Southdown, if you want to try and fit it into Paradise and you look at the statute and you say, there was a formula for the statute, it came from the statute. The appellant argues that there is an established market price for this stock, and that is their argument, and that's why they say prejudgment interest is allowed. And there was no established market for that stock. The appellant just argued that on May 15, 1996, their expert said he could sell it in a block, which he could. Restricted stock, he couldn't sell it on the market. But if you check the record, 296, record on appeal at 79, when their expert was testifying about what the discount would be in that, his words are, it's impossible to really tell. Now let's look at the other way they tried to get a market price, an established market price on that stock. Mr. Kennedy very carefully used the word market data. That's not what Paradise Home says. Paradise Home says you need an established market price before you can get prejudgment interest. The second way they got the established market price was they had their expert testify if he slowly leaked it out. He would wait a year until 1997. He would make over 150 small sales over a two-year period, and the figure he came out with at the end of the day on that calculation was $600,000 more than what the jury came back with. I submit, when their own expert says one method, it's impossible to tell, and when another is off $600,000, that does not connote that there is an established market price out there. This gets us to the Nevada case, the Jeunesse case. Jeunesse case dealt with two partners in an oral agreement. It was a rent contract. They did not know what the damages were until the trial established them. Now, they knew performance dates because they went back and they could see the rent every month. There was rent coming in and it was due, and the partners could split it. But the Jeunesse case, and it says, and it is specifically on point, if the damages are unknown and unassertainable until judgment, then there can be no prejudgment interest. Did we get it dead wrong in N. Ray Siegel then? Your Honor, I apologize because I am not familiar with that case. I also focused on the Nevada law. Well, it's our Ninth Circuit case that deals with this entire area. John Noonan wrote a decision talking about Paradise and all the rest of this and allowed something very similar to what we have here. You're not familiar with N. Ray Siegel? No, Your Honor. On the Nevada law, under the Paradise factors, you need all three. The rate, again, which is statute. The amount, which is at issue in this case. And again, the only way appellant has said they determined the amount is relying on established market prices. I guess here's the thing is that even though maybe it's a little unfair because you don't have Siegel in front of you, but basically the argument made in Siegel was the same one here where it was said that neither Leroy's nor Rackusen nor anyone else could know the amount that would be due to Rackusen prior to the jury's verdict. That's the argument made in your case. Correct, Your Honor. And if you took those words and you substituted the parties in the Siegel case, it was exactly the same argument that was made. And so it boils down to whether the fact that you need the jury to come up with the amount, in effect, is a disqualifier and kicks you out of the prejudgment interest statute. And as I say, Siegel says it doesn't, but that's also what Southdown says, is that having the jury determine that dollar figure doesn't somehow take you outside the ambit of Paradise. But, Your Honor, Southdown had a formula. It might have been by statute, but there was a formula there to determine the amount. There is no formula in our case. We've got a four-sentence contract. That's the difference. If there's a formula in the contract, the parties may differ on how to weigh each factor in that formula, but the contract has a formula. Why isn't there a formula again? I'm just not following you. Four and a half percent of X plus Y equals a formula. Your Honor, there is a formula for the shares of stock, but the issue became reducing the stock to damages. We paid the stock. The appellant did not want to take it. We paid the first judgment. The appellant took that, and now he's wanting, on all of this time, prejudgment interest. But the formula goes to the stock, and just as the Ninth Circuit said in its earlier remand order, the court should not have stopped there. The formula should have kept going to the damages issue. And to say that the damages were based upon established market value would be to ignore the language of the Ninth Circuit's remand in the last case of the items that needed to be found, and it would also be to ignore the necessity of a two-day jury trial to establish the value of this stock. Let's take it in a different context. If we had a personal injury case here, we would say, well, you're not going to get this prejudgment interest because we don't know, you know, there's no way to determine what the pain and suffering was on the date of the injury. Maybe on lost wages there would be, but not on pain and suffering. But here they basically tell you on the date in question, you get 4.5 percent of the final evaluation of the common stock. So the only thing that's missing there is the figure to which to apply the 4.5 percent, correct? The dollar amount of the stock after the 4.5 percent, which we tried to get. Well, but not the dollar amount after. That's just an arithmetic calculation. You need 4.5 percent times X equals Y. And what you're missing is the X. Is that correct? You're missing the value. If I'm following, and, Your Honor, I'm going over my time. I really don't want to take from Mr. Hartoonian's time. But if I'm following you correctly, you are saying that you take the formula, and the formula gives you a multiple, and that gives you where you come out with the 337,500, and then we are missing the X to come out and multiply that by the dollar figure. That's what was never answered. The jury tells us the amount is. Yes, Your Honor. And you're saying that because that amount, in your view, isn't fixed, that we can't apply the prejudgment interest statute. Your Honor, it's not because it's not fixed. It's because there is no way in that contract to determine the dollar amount. And if you look at the point. I have your point. So I don't want to take up more of his time, but I think I understand your point. Thank you. Thank you. If it please the Court, my name is Hartoonian, and I am the appellee in 16245 and the appellant in two other dockets. Mr. Rackerson. One question right off the bat, Mr. Hartoonian. When this contract was signed for representation of Mr. Rackerson, it was signed with Hartoonian and Associates? I don't recall. I did use that. That's the way. I think I used that term a lot. My question is, yeah, nothing wrong with that. It's just that in dealing with Mr. Lienberger, Lienberger, how do you pronounce it? Yes, Lienberger. Lienberger. Was he one of your associates at the time? He was an employee. He was an employed lawyer of mine. Of yours at the time that the work was done? Yes. Of all of the services that he performed for which you're claiming? That's correct. And Mr. Bradkey, which was another one of the outside lawyers, was my partner. He left the firm. I think he left my firm before I started doing the work for Mr. Rackerson. But then we were a constant associate in many cases thereafter, too. And where do we look in the record to confirm the partner and employee status? I'm sorry. Where do we look in the record to confirm the partner and employee status of these other lawyers? The record is clear about Mr. Lienberger being my employee. I called him my associate, and I believe that that can be found. I can find the place in the excerpts where that can be found. I'm not sure if Mr. Bradkey is described in any way other than the fact that he was employed as an outside lawyer. Okay. Now, with respect to the first payment, what they're saying is that the amount I was paid in 1997 after that tentative recovery, which was later reversed, paid me for my time spent up until that time. But that's just plainly wrong. What I was paid at that time was pursuant to a percentage agreement, which was later terminated. But the percentage agreement at that time called for me to get a certain percentage of any amounts recovered, and, of course, it contemplated a percentage recovery of the final recovery. And then I was paid that amount because the amount recovered was X, and I get 25% of X. If we had recovered $10 million and I had only put in 1,000 hours, we would still get that much of a fee. Or if the amount was $10,000 and I had put in 10,000 hours, I would still have gotten the agreed percentage. So the idea that I was paid at that time for the time and work and services that I was, well, it's just simply wrong. When that agreement was later terminated by the client, there was no other way for the court to do a quantum merit determination than to look at the whole case. Incidentally, I suggested to the court at that time it could do the quantum merit determination in either of two ways. It could do it by a percentage, or it can do it on the lodestar basis of time and value and so on. And they absolutely insisted that it be on the lodestar basis. They wanted no part of percentage. So the judge, either in his own decision, thinking it was better or to accommodate them, did it on the lodestar basis, and he could only do it on the basis of the whole case. There's no way of mixing apples and oranges to say that this recovery here marks a time when we're going to ignore all the time spent before that. As a matter of fact, as I point out on the brief, time spent before that first recovery didn't just produce that first recovery. That was all the pretrial discovery. It was the trial of the case. It was just before the first appeal. But that work redounded to the benefit of my client's case throughout. It wasn't just that time. And so for that reason, you cannot really separate one piece of the work of a case from another in deciding how much contributed to the final result. And so it's pretty clear that although we fault the district judge for several things, his methodology was correct in taking the whole case and looking at it value of the services was and then subtracting the amount which I had previously received. On the question of outside lawyers, there is no rule, no case, no statute, nothing, anywhere, that forbids a lawyer from hiring outside counsel for which the client then has to pay. Without the client's consent? Yeah, without the client's consent, yeah. Common sense would be the rule it would seem to me. The only restriction, and this is clear, we've cited cases and treatises, is that you not thereby increase the charges to the client. That is the only one. In fact, one case we cite from, I think, Massachusetts, says of course a lawyer can hire outside lawyers as long as he doesn't increase the cost. Well, doesn't this increase the cost? If I were to hire a lawyer whose time now is No, doesn't this increase the cost to the client? What you're asking for? No, no. As a matter of fact, there are two different things I have to point out. At the time I hired the outside lawyer, it was my expense alone because I was working under a contingent percentage. Right. He would have had no responsibility for it at all. The second thing is even now in retrospect, now that it's a lodestar method of determining the value of all the services, it still doesn't increase the cost to him because the lawyers whom I hired had hourly rates lower than mine. Had I done the work instead of them, it would have been hired that way instead of this way. So in neither respect did what I did in hiring outside lawyers violate any rule. The only case they cite for this proposition that you to support the district judge's idea that only lawyers with whom he has an agreement you can get recompensated for is this case of Lehrer. And Lehrer is a case that holds one simple thing, and that is that these outside lawyers don't have a direct lien claim against the client. And that has nothing to do with this question, nothing whatever. Let me give an example. Suppose a client comes to me, as was the case here, and I sign an agreement with them. I don't have to walk that client around to every employee in my firm to say this guy is going to do some work and this woman is going to do some work and sign an agreement with them. Certainly not. I can parcel out work to any of those lawyers. Because that's because they hire the firm. Yes, you might say that. But the question is do they hire lawyers that aren't in the firm? Well, I was what I was going to suggest is that the analogy is so close that the answer is that the lawyer is vested with judgment about who he's going to use to help him. In most cases they will be employees of his firm. And as a matter of fact, if after the client signs the agreement I then hire a new lawyer, someone never contemplated by anybody, and that new lawyer comes into the firm, I don't have to get an agreement between the client and that new lawyer. I can parcel out work to him. And that's because they hired the firm. Well, correct. It's because he hired me and gave me the discretion to do things like this. For example, he gave me, as a lawyer must be entrusted to the judges, to the lawyer's judgment, who he's going to hire to prepare exhibits, who he's going to hire as an expert witness, all these various things that are entrusted to the lawyer's judgment. The client doesn't have the expertise to take part in that. And so the idea of hiring an outside lawyer and having, in this case, over $100,000 of services that he should get for free, that's totally untenable. Who's Johns? Larry Johns succeeded the firm of Hale Lane as the local counsel. I mean, he's got a lot of ---- But the court found that he actually agreed to Mr. Johns' joint representation, correct? I think ---- But he didn't find that as to some of these other collateral people. No, he didn't. He simply ---- he compensated me for, I guess you might call it the expense of Mr. Johns or the value of his services, I don't know which, but none of the others. And the other lawyers who include my own employee, Leinberger, and my former partner, Bradkey, and those other three lawyers that I ---- one is a former district judge and one is a former clerk of this court and another is an office associate whom I consulted about the idea of possibly waiving the remand after the first trial. All of that time, the judge refused to compensate me for it, and it comes to over $100,000. That's just completely untenable. There's no basis, no rule behind it. I want to add that the business about the expenses, the district judge refused to allow me any expenses except taxable costs. And that's just completely wrong because the client does indeed owe for that. And I can't help but make it sound like I'm sticking my nose in somebody else's business, but he owes me prejudgment interest for that. And I made a point of making that point in the brief. It's only, I have to laugh, only $20,000. But I think the important principle is that no one, particularly a wrongdoer, is entitled to the free use of somebody else's money. And that's what underlays the prejudgment interest statute. Now, I know it sounds like I'm meddling in somebody else's case, but I can't help, I can't resist. I see my time is up, so I don't get to the question of enhancement. Thank you. Thank you, counsel. Do you have any response? If I can have more than one second that I have, I think I can do it in one minute. Go ahead. First, with respect to what Mr. Hartoonian said about hiring other lawyers to help him and having some sort of inherent authority to do so, one case that we cited, and I think it's called Handelman, involves a lawyer who did that and was disciplined by his bar association because he didn't have the client's consent to do that. And the discipline in that case said you can't go out and hire someone else, divulge your client's secrets to them, matters that you're supposed to keep as confidential, and allow other people to work on the case without the client's consent. Does it matter if it's an associate or if it's an employee? Of course. The distinction is important. Yeah, the distinction is important because if one retains a law firm, if a client retains a law firm, then you retain the lawyers. And wasn't that the arrangement here? Wasn't it Hartoonian Associates? Well, we don't know that. Okay. We don't know from the record who was an employee. What was the original contingency fee was in writing. That wasn't an hourly fee. That's right. And what you have is, and that cuts right to the heart of the problem, you have an original contingency fee agreement. You retain a firm on a 33 percent contingency fee, and that's paid. And then the firm says, oh, by the way, we have hourly charges for all these other lawyers out here. He says that Mr. or Ms. Lineberger, I'm not sure which it is, is an employee, an associate, and that's referred to in the record. Do you argue with that? Well, I don't know where that is in the record. What I'm saying, Your Honor, is this. Then we can ask Mr. Hartoonian to do like we did one of the earliers. He can fill out a little form and tell us where to look in the record for Mr. Bradley as a partner, Ms. Lineberger as an employee. Right, because I don't think any of that is in the record or was argued to the district court. How did we get this far on these issues, and we don't know who these people are and where they fit into the picture? Well, that wasn't my burden. I simply responded to the fee request for these people by saying, in essence, who are they? My client, Mr. Rackeson, never agreed to hire them and has no idea who these people are that he's getting. You didn't say who are they, and my client has no idea who they are. Well, that's in our opposition to the fee motion. I don't have it in front of me, but I'll provide that. What did the other side say when you said, who are they? And that's not in the record? I don't believe that they sufficiently responded to it because they're not as they have here. No, because the district court said, I'm not going to award it. What did they say? I don't recall exactly what they said, but they didn't sufficiently point out either that Mr. The argument that was made in the brief was there was a citation to C.J.S. and a couple of old cases that predate the adoption of the model rules of professional conduct. Well, you would agree that if they were within his firm, it would have been appropriate. No. You don't agree to that? I do not agree to that, and the reason for that is this. If somebody hires my firm on a contingency fee basis, the case is tried and is paid. The contingency fee is taken. Could I then come back later and say, by the way, I have hourly charges? But that fell out. But that went away. It went away. That fell out. Okay. So you're dealing pure quantum merolat? Pure quantum merolat. Can't charge for an associate? No. You know why? Because the bills that were submitted were Mr. Hartoonian's bills. And associates. And then he says I have the ---- But it was submitted as expenses rather than as some kind of a part of the agreement. Well, it wasn't an agreement anymore, so it was quantum merolat. That's one of the problems is would you ---- but the contingency agreement is with Hartoonian and associates. Is that correct? I think that's right. And that's a firm? Apparently. Hartoonian and associates PC. What do you mean apparently? No, she said that's a firm. And I say apparently there are other associates. Well, so that's professional corporation. But what we're doing is we're reviewing what the district court did for an abuse of discretion. The district court denied those claims because you could only deny them for one reason. There's not proof. There's no evidence. There's no evidence to support them. And what we said was, and I obviously paraphrase it, who are they? We never agreed to their hiring. And that's in Mr. Rackerson's affidavit that is attached to our opposition. If we go through the record, we're going to find out the other side babbled and said nothing comprehensible. Essentially, yes. Essentially, yes. We'll look. Well, I know you will. Two other points. And I invite you to do that. And two other points. First, the argument that was made by AWI that somehow there is a formula in the Southdown case that was simply followed, there's no formula in that case. What the district court did was appointed three appraisers and said, go out and do appraisals. Now, that's pretty close to what we did here. My final point, the characterization of John Main's testimony, which was something, John Main was our expert on valuation, which it was characterized as something, well, I really can't say. I really don't know. If you look at excerpt of record 296 at page 80, beginning at line 10, you will see my question where I say, okay, and if he had done that, if he had just dumped it all on the first day that he got it or he was supposed to have received it, did you do that calculation? Answer, I did. I don't have that number committed to memory. So if you're going to ask me for that, you better give me that number. But it's close to this number. It's 337,000 times 6.75. That's correct. And then he says, okay, and I happen to have done that calculation. I'll have to read it. $2,278,125. I mean, he doesn't say I don't know or I'm guessing. He just says, there it is. I've done the calculation. And that was Mr. Main's testimony. Thank you, counsel. Thank you. With respect to what? Talk on the mic, please. I merely want to invite Your Honor's attention to my excerpts of the record, pages 045 to 085, which is from record 215. Thank you. And what does that refer to? That has to do with the other lawyers. Okay. 045 to 085? Yes. Thank you. 045. The case just argued is ordered and submitted. We'll be in recess until tomorrow morning at 9 o'clock. Thank you. All rise. The clerk will discover what gremlin is inhabiting our courtroom.  Even though that's not what the gremlin is. I mean, that's not what the gremlin is. Well, I don't understand. I don't understand what happened. You guys.
judges: Meskill, Trott, McKeown